## IN THE UNITED STATES DISTRICT COURT
## FOR THE WESTERN DISTRICT OF VIRGINIA
### Harrisonburg Division

| | |
|---|---|
| NOBLE SUPPLY & LOGISTICS, LLC )<br>*One Marina Park Drive, Suite 220* )<br>*Boston, Massachusetts 02210* )<br> )<br>Plaintiff, )<br> )<br>v. )<br> )<br>REBECCA CURRY )<br>*15913 Paisley Lane* )<br>*Bowie, MD 20716* )<br> )<br>Defendant. )<br> ) | Case No. <u>5:23-cv-00065</u> |

## VERIFIED COMPLAINT

Plaintiff, Noble Supply & Logistics, LLC ("Noble" or "Plaintiff"), by counsel, sets forth the following as its Verified Complaint against Defendant Rebecca Curry ("Defendant" or "Curry") for breach of contract.

## NATURE OF THE ACTION

1.      This is an action to stop Curry from violating her non-competition and other restrictive covenant obligations to Noble. Curry was a key employee of Noble and its predecessor for approximately thirteen years, most recently serving as Director of Category Management. In August 2023, Curry left Noble to work for Noble's direct competitor, non-party SupplyCore Inc. ("SupplyCore"), in the position of Director of Vendor Management & Supply Chain, in which she performs the same or substantially similar services or work as she performed for Noble, in violation of her restrictive covenant obligations to Noble. Although SupplyCore has represented to Noble that Curry's employment does not breach her obligations to Noble, her continued employment as

Director of Vendor Management & Supply Chain violates her agreement and irreparably harms Noble. Moreover, subsequent evidence has shown that Curry has promoted sales on a contract that Noble and SupplyCore both supply and that she has actively solicited business from the network of vendors Noble paid her to build. Because Curry is providing prohibited competitive services and has demonstrated that she is willing to interfere with Noble's business, she has left Noble no choice but to seek redress from this Court to (1) enjoin Curry from violating her agreement with Noble; and (2) award damages for the injuries Curry has caused.

## THE PARTIES

2.    Noble is a Delaware limited liability company with its principal place of business in Boston, Massachusetts.

3.    Noble.com, LLC is Noble's sole member. Noble.com, LLC is a limited liability company organized under the laws of Delaware.

4.    Noble Equity Holdings, LLC is Noble.com, LLC's sole member. Noble Equity Holdings, LLC is a limited liability company organized under the laws of Delaware.

5.    Noble Holdco, Inc. is Noble Equity Holdings, LLC's sole member. Noble Holdco, Inc. is incorporated in the State of Delaware and has its principal place of business in Boston, Massachusetts.

6.    On information and belief, Curry is a United States citizen who resides at 15913 Paisley Lane, Bowie, Maryland, 20716.

## JURISDICTION AND VENUE

7.    This Court has subject matter jurisdiction over this matter pursuant 28 U.S.C. § 1332(a)(1) because the parties are citizens of different states and the amount in controversy exceeds $75,000.

8.      This Court has personal jurisdiction over Curry because Curry worked for Noble for years out of Noble's Harrisonburg, Virginia location.  Curry also regularly traveled to the Harrisonburg, Virginia office for business purposes both as an employee of Noble and as an employee of Noble's predecessor-in-interest, Tactical & Survival Specialties, Inc. ("TSSi"), which was headquartered in Harrisonburg.

9.      Venue is proper in this district because, as a condition of Curry's employment with TSSi, Curry and TSSi executed a Confidentiality and Anti-Piracy Agreement (the "Agreement," **Exhibit A**) dated October 11, 2010, in which "The parties agree and consent to the sole jurisdiction in the applicable state and federal courts of Virginia." (Ex. A ¶ 11.)

10.     Venue is also appropriate in this judicial district under 28 U.S.C. § 1391(b)(2) because a substantial portion of the events giving rise to this Complaint occurred in this district.

## FACTUAL ALLEGATIONS COMMON TO ALL CLAIMS FOR RELIEF

### A.  Background on Noble and its Confidential Information and Trade Secrets

11.     Noble is an industry leading global provider of integrated supply, procurement, and logistics solutions to the U.S. government and private sectors.  Noble provides services to all branches of the United States military, law enforcement and emergency response agencies, other government organizations, and the defense industry.

12.     Because Noble's customers are located throughout the United States and around the world, Noble provides services, and competes to do so, on a global scale.

13.     Noble supplies its clients with everything from industrial products, construction equipment, office furniture and supplies, personal protective equipment, military and law enforcement gear, appliances, electronics, to food service and janitorial supplies.

14.     Because of the competitiveness of the market, Noble depends on its ability to maintain the secrecy of its confidential and proprietary information, including pricing information, cost information, forecasts, sales performance data, formulas, sales and market strategies, proposals, pricing, bids and quotes to customers and prospective customers, internal costs, customer and reference lists and private information about the people and companies with whom Noble does business.

15.     Noble's confidential, proprietary and trade secret information is not available to the public and is not generally known in the supply, procurement, and logistics industry.  Noble expended significant effort and expense in developing its confidential, proprietary and trade secret information.

16.     The value of Noble's confidential, proprietary and trade secret information lies in its exclusive use by Noble and its employees.

17.     Noble would lose its competitive advantage if one of its competitors obtained its confidential, proprietary and trade secret information.  For example, a competitor, like SupplyCore, could use Noble's confidential cost and pricing information to underbid Noble to sell its products to Noble's customers.

18.     As such, Noble goes to great lengths to protect its confidential, proprietary and trade secret information.  For example, Noble requires all employees (including Curry, as discussed below) to sign confidentiality agreements.

19.     To further safeguard its property and information, Noble uses password protection to limit access to sensitive information, requires all employees to review and acknowledge its information security policy, and provides access to financial and bid proposal information only on a need-to-know basis.

**B.  Noble and SupplyCore Are Direct Competitors**

20.     SupplyCore is one of Noble's main competitors.  Like Noble, SupplyCore is a national provider of supply, procurement, warehousing and facility support, distribution, and logistics services.  SupplyCore focuses on providing base operations supply, weapon systems support, and tailored logistics support.

21.     SupplyCore performs the same services as Noble, competes for many of the same contracts, vendors, customers and clients as Noble, and competes in the same geographic markets as Noble.

22.     Both Noble and SupplyCore are prime vendors on the Defense Logistics Agency's ("DLA") Special Operational Equipment Tailored Logistics Support Program contract (the "SOE Contract").

23.     The SOE Contract offers all branches of the military and federal agencies access to the latest commercial equipment, services, and training.

24.     The SOE Contract is a ten-year, multi-billion-dollar multiple award indefinite delivery, indefinite quantity contract that was awarded to Noble, SupplyCore, and four other businesses.  Only those six awardees can provide the equipment, services, and training required by the DLA under the SOE Contract.  Thus, under the SOE Contract, Noble and SupplyCore are direct competitors.

25.     Noble and SupplyCore similarly compete for contracts with the General Services Administration ("GSA") generally, and specifically to provide Maintenance, Repair, and Operations Tailored Logistics Support services to the DLA and otherwise.

C. **Curry's Confidentiality and Anti-Piracy Agreement**

26.    As a condition of Curry's employment with TSSi, Curry entered a Confidentiality and Anti-Piracy Agreement (the "Agreement", **Exhibit A**) dated October 11, 2010.

27.    As the successor-in-interest to TSSi, Noble now owns all TSSi goodwill and assets, including the Agreement.  (*See* Ex. A ¶ 12 ("The Employee acknowledges and agrees that this Agreement shall be assigned or transferred to, and shall be binding upon and inure to the benefit of, any successor or subsidiary of the Company . . . .").)

28.    In her role at Noble, Curry received, had access to, and in some cases developed or directed the development of Noble's proprietary and confidential information, including (1) pricing and logistical information relating to Noble's management of its government contracts; (2) margin and profitability information; (3) potential opportunities for Noble's business, and strategies to pursue those opportunities; (4) marketing strategies; (5) vendor preferences, strengths, and weaknesses; and (6) other business and sales strategies.  Possession of such information would provide a competitor an enormous unfair advantage by giving that competitor all the information it needs to effectively undercut Noble in the marketplace.

29.    As part of the Agreement, Curry agreed that she had a duty of loyalty and confidentiality to TSSi and promised that, throughout her tenure, she would "not engage in any acts in competition with the Company, or that may be harmful to the Company's interests."  (Ex. A ¶ 1.)

30.    Curry also promised that "During [her] employment with the Company, and for a period of thirty-six (36) months after the separation of the Employee's employment with the Company for any reason, whether voluntary or involuntary, the Employee agrees not to use or disclose, other then [sic] for the benefit of the Company in the course of [her] duties for the

Company, the Company's Confidential and Proprietary Information, regardless of whether the Confidential and Proprietary Information was in hard copy or other form, or contained in the Employee's memory or derived from [her] experience."  (Ex. A ¶ 2.)

31.    Curry further promised that, upon cessation of employment, she would "immediately surrender to the Company . . . any and all Confidential and Proprietary Information of the Company (together with all copies thereof), regardless of whether such information was obtained by the Employee or entrusted to the Employee by the Company during the course of [her] employment . . . ." (Ex. A ¶ 2.)

32.    Curry also entered into certain covenants prohibiting solicitation of customers and employees.  (Ex. A. ¶¶ 3-4.)

33.    Regarding non-solicitation of customers, Curry promised that:

during Employee's employment with the Company, and for a period of eighteen (18) months after the separation of the Employee's employment with the Company for any reason, whether voluntary or involuntary, [she] will not, directly or indirectly, sell to, service and/or in any way solicit (in person, telephonically, through e-mail and/or through any other medium or person), for the purpose of selling or providing products or services competitive with the products and services of the Company, any person or entity that was a client or customer of the Company, or was a prospective client or customer of the Company (meaning any person or entity that was actively solicited by the Company), during the twelve months prior to the date of the Employee's separation from the Company, with which the Employee had "material contact" (which is defined as being directly involved in the solicitation, sale or quotation of the Company's products or services), or about which the Employee has "material knowledge" (which is defined as having material and substantive knowledge of the Company's efforts to solicit, sell to, or quote the Company's products or services to the prospect or customer, or of the services provided to the customer by the Company).

(Ex. A ¶ 3.)

34.    Regarding non-solicitation of employees and contractors, Curry promised that:

during the Employee's employment with the Company, and for a period of eighteen (18) months after the separation of [her] employment from the Company for any reason, voluntary or involuntary, [she] shall not, either directly or indirectly, recruit

for placement or employment, or induce to terminate his or her employment with the Company, any person who is then employed by the Company.

(Ex. A ¶ 4.)

35.    Curry also entered into certain non-competition covenants (the "Non-Competition Covenants"). (Ex. A ¶ 5.)

36.    First, Curry acknowledged that "[she] has and will have access to and knowledge of highly confidential and proprietary information regarding the Company including, for example, the Company's profits, margins, cost structure, key employees, marketing strategies, finances, customer and vendor relationships, and growth plans." (Ex. A ¶ 5.)

37.    Accordingly, Curry promised that:

in order to protect the company's legitimate interests in its highly valuable information Employee covenants and agrees that [she] ***will not***, during Employee's employment with the Company, and for a period of twelve ( 12) months after the separation of [her] employment from the Company for any reason, voluntary or involuntary, ***engage in the same or substantially similar services or work as [she] performs for the Company*** for [herself], or ***for any business or other entity, that is competitive with the business of the Company***, within a geographic area comprised of the territories assigned to Employee and for which [she] had responsibility during the twelve months immediately prior to the separation of [her] employment from the Company.

(Ex. A ¶ 5) (emphasis added).

38.    Curry further acknowledged that "this geographic area is reasonable and appropriate because it is the geographic area in which [she] has/had direct responsibility and authority for the Company and because [she] has/had access to confidential and proprietary information of the Company pertaining to customers in this geographic area." (Ex. A ¶ 5.)

39.    Curry agreed that "that this restriction is reasonable and appropriate due to the narrow scope of the Company's business, as a result of which the Employee has ample opportunity to obtain employment without violating the terms of this Agreement, and without suffering

8

hardship or duress" and that "neither [she] nor [her] family will suffer irreparable harm as a result

of the enforcement of the provisions set forth in this paragraph and in this Agreement."  (Ex. A ¶

5.)

40.    Regarding enforcement of the Agreement, Curry acknowledged that:

in addition to an appropriate award for damages, the Company shall be entitled to
the entry of a temporary, preliminary and permanent order enjoining further
threatened or actual breaches of the Agreement by him or any person, firm, or entity
with which [she] is associated, without the need to post a bond or other security,
and to collect from the Employee all costs of the Company, including reasonable
attorney's fees, incurred by the Company in enforcing and/or defending any of the
terms or provisions of this Agreement.

(Ex. A ¶ 6.)

41.    Curry also agreed to a Virginia choice of law and forum provision.  (Ex. A. ¶ 9

("This Agreement shall be governed by and construed and enforced in accordance with the laws

of the Commonwealth of Virginia, where the Company currently has its headquarters, and where

the Employee will have contacts and business dealings. The parties agree and consent to sole

jurisdiction in the applicable state and federal courts of Virginia.").)

42.    Additionally, Curry agreed to a tolling provision that provides "in the event of an

actual or threatened breach of the Agreement, as a result of which the Company successfully

obtains injunctive relief enforcing any provisions in the Agreement, the periods described above

in paragraphs 2, 3, 4 and 5 will not begin to run until the date on which such injunctive relief was

secured, so that the Company, beginning on such dates, will receive the benefit of the full periods

to which the Employee agreed herein."  (Ex. A ¶ 15.)

43.    Finally, Curry promised that "in the event [she] interviews for or otherwise

discusses employment opportunities with a competitor of the Company while this Agreement is in

effect, [she] will inform such prospective employer of the Agreement, and the nature of its terms and restrictions."  (Ex. A ¶ 16.)

**D.  Curry's Employment with Noble and Breach of the Agreement**

44.     Curry was a key employee of Noble from October 2010 to August 2023.

45.     Before her employment with TSSi and Noble, Curry had little or no experience in the government contracting industry.  Noble expended significant time and effort to train Curry and to ensure her success with the company.

46.     Curry came to Noble as a result of Noble's acquisition of TSSi, completed in March 2021, which was a direct competitor of Noble, providing similar supply, procurement, and logistics services to government clients in the same market, and for which Curry performed substantially the same job duties.

47.     As the Director of Category Management, Curry was responsible for developing and maintaining vendor strategy to align with Noble's objectives.  Curry's job duties included developing strong vendor relationships, negotiating business terms with vendors, and overseeing supply chain management to meet contractual, price, delivery, and quality targets and obtain competitive advantages for Noble with pricing, terms and conditions.

48.     While Curry reported directly to the Vice President of Category Management, she had a matrixed relationship with the market leaders, sales representatives, and business development managers and representatives.  Curry worked directly with market and sales leaders as well as the members of the sales and business development teams to assist them with winning business.

49.     Additionally, Curry was directly involved in bid and pricing strategy on GSA and DLA contracts, including the SOE Contract.

50.    As Director of Category Management, Curry was responsible for a vendor management territory comprised of the entire United States.

51.    Indeed, in the final year of her employment with Noble, Curry was directly responsible for managing numerous vendor relationships, which are located throughout the United States and beyond, from Washington state to Wisconsin, Georgia, Florida, Vermont, Connecticut, New Hampshire, and even the United Kingdom.

52.    Throughout her employment with Noble, Noble provided Curry with access to Noble's confidential, proprietary, and trade secret information.  For example, Curry was provided access to NetSuite, Noble's Enterprise Resource Planning System, from which Curry had access to pull reports with strategic pricing and other business information.  She also had access to Salesforce, which contains the company's entire sales and business development pipeline.  Curry relied on Noble's confidential, proprietary, and trade secret information to carry out her job duties for Noble.

53.    While employed by Noble, Curry engaged in negotiation with SupplyCore for employment without notifying Noble.

54.    While employed by Noble, and before giving notice of her resignation, Curry accepted an offer of employment from SupplyCore.

55.    During her interviews with SupplyCore, Curry denied having a restrictive covenant agreement with Noble, in violation of her contractual obligation to do so.

56.    Curry's last day of employment with Noble was August 11, 2023.  Shortly thereafter, on August 14, 2023, Curry began working for SupplyCore as Director of Vendor Management & Supply Chain.

57.    As Director of Vendor Management & Supply Chain, Curry's duties for SupplyCore are the same as, or substantially similar to, the duties she performed for Noble.

58.    SupplyCore is competitive with Noble in the same geographic area (the United States) assigned to Curry and for which she was responsible during the twelve months immediately prior to her separation from Noble, including on the SOE Contract, on which Noble and SupplyCore are both prime vendors.

59.    On August 15, 2023, counsel for Noble contacted SupplyCore to raise its concerns regarding Curry's Agreement and its various covenants. Counsel for each party spoke on the phone the next day, and counsel for SupplyCore indicated he would follow-up with a letter from SupplyCore stating their position on the Agreement.

60.    On August 18, 2023, counsel for SupplyCore sent counsel for Noble a position letter (the "Letter," **Exhibit B**) that confirmed that, as Director of Vendor Management & Supply Chain for SupplyCore, Curry would continue to engage in the same or substantially similar services or work for SupplyCore as she did for Noble, namely, and among other things, vendor management.

61.    Counsel for SupplyCore confirmed that Curry did not inform SupplyCore about her Agreement with Noble during the interview process, and that SupplyCore did not learn about the Agreement until August 10, 2023, just four days before she started. (Ex. B at 2.)

62.    Notably, counsel for SupplyCore did not contest that it was a direct competitor of Noble within the geographic area assigned to Curry in her final twelve months of employment with Noble. (*See* Ex. B).

63.    Instead, counsel for SupplyCore took the position that if Curry refrained from vendor management related to tactical gear and medical supplies and focused on other

commodities for one year, she would not be in breach of the Agreement. (*See* Ex. B at 1-2.) Indeed, SupplyCore attached to the Letter a letter agreement entered into with Curry prohibiting her from, *inter alia*, "sharing information on, soliciting, or engaging with any customer or supplier specific to the Tactical Gear and Medical commodity categories or any related commodity categories you have previously managed," and "hav[ing] any contact with customers or suppliers you previously engaged with at Noble Supply & logistics [sic]" or sharing related contact information with SupplyCore. (Ex. B at 3.)

64.     This artful phrasing neither addresses Noble's concerns nor accounts for the full scope of Curry's obligations. Noble's Agreement with Curry does not restrict her based on certain commodity categories, but based on the services she provided Noble. Again, Curry provides the same services, including vendor management, to SupplyCore in her position as Director of Vendor Management & Supply Chain as she provided to Noble as Director of Category Management.

65.     Furthermore, Curry's work for Noble was not strictly limited to tactical and medical commodities. Although those were her primary commodity categories, her work touched other commodity categories and related vendors through trade shows, Noble industry shows, and discussions with team members and sales and market leaders.

66.     Nor was Curry's access to Noble confidential, proprietary, and trade secret information limited to tactical and medical commodity categories. Rather, Curry was provided full access to strategic pricing and business information through NetSuite, as well as sales and business development pipeline through Salesforce for all commodity categories.

67.     Moreover, SupplyCore's letter agreement with Curry has not been effective at keeping her from helping SupplyCore to directly compete with Noble, or from contacting the vendors for which she was responsible at Noble.

68.     Specifically, since signing the letter agreement on August 12, 2023, Curry has aided

SupplyCore in directly competing against Noble on the SOE Contract and otherwise, including

but not limited to, by soliciting business and promoting SupplyCore SOE Contract sales on social

media to her professional network, which includes her contacts at the vendors for which she was

responsible at Noble in her final twelve months of employment, all in breach of her Agreement

with Noble.

69.     On LinkedIn in early September 2023, Curry reposted to her 781 followers a post

from SupplyCore promoting its SOE Contract and soliciting orders through it before the 2023

fiscal year end.  (Curry LinkedIn Activity, **Exhibit C** at 2.)   The post advertised "YOUR

WISHLIST, OUR COMMAND" and solicited submission of orders from SupplyCore by

September 15.  (Ex. C at 2.)

70.     Additionally, in mid-August 2023, Curry announced to her 781 followers that she

had joined SupplyCore as Director of Vendor Management & Supply Chain.  The post generated

over two dozen comments, including many from various vendors that were a part of her

professional network during her employment at Noble indicating they were excited to do business

with her.  (*See, e.g.*, Ex. C at 3-6 (J. Clarke: "Awesome! I don't have your number any more, [hit

me up]"; M. Stucki: "Congrats!! [Celebration emojis] I am so happy for you. Looking forward to

catching up. And hope to do business with you soon."; J. Hughes: "Talk to me Goose.").)

71.     The post also reached her contacts at the vendors for which she was responsible at

Noble in the final twelve months of employment.  For example, David Jackson, Director of

Government Sales at High Speed Gear, commented "Love this, let's do some business now!"  (Ex.

C at 5.)

72.     Also in mid-August 2023, Curry reposted to her 781 followers a SupplyCore post advertising that SupplyCore would be at a certain industry conference and exhibition from August 18-21, 2023, their booth number, and soliciting customers and suppliers to visit.  (Ex. C at 2-3.)

73.     The post also reached her contacts at the vendors for which she was responsible at Noble in the final twelve months of employment.  For example, David Jackson, Director of Government Sales at High Speed Gear, commented "Booth 1885 for me. Let's do some business. Send the team my way."  (Ex. C at 3.)

74.     Noble is entitled to preliminary and permanent injunctive relief enjoining Curry from such prohibited conduct including, among other things, continuing to provide the same or similar services to SupplyCore as she provided to Noble, and soliciting Noble's clients, customers, and prospective clients and customers.

## CAUSES OF ACTION

## COUNT I – BREACH OF CONTRACT

### (Non-Competition Covenants)

75.     Noble incorporates Paragraphs 1 through 74 by reference.

76.     The Agreement attached as **Exhibit A** is a valid, binding, and legally enforceable contract between Noble and Curry.

77.     Noble and Curry exchanged adequate and sufficient consideration in connection with the Agreement.

78.     The restrictions on disclosure of confidential information, non-solicitation, and non-competition in the Agreement and described above are valid, reasonable, and enforceable.

79.     The restraints imposed by such restrictions are no greater than necessary to protect Noble's legitimate business interests.

80.    The restrictions contained in the Agreement are not unreasonably harsh or oppressive in curtailing Curry's legitimate efforts to earn a livelihood, as agreed by Curry.

81.    Indeed, Curry contractually agreed that the Non-Competition Covenants were "reasonable and appropriate due to the narrow scope of the Company's business, as a result of which the Employee has ample opportunity to obtain employment without violating the terms of this Agreement, and without suffering hardship or duress."  (Ex. A ¶ 7.)

82.    The restraints imposed by such restrictions are reasonable from the standpoint of public policy and are consistent with industry standards.

83.    The temporal limitations set forth in the confidentiality, non-solicitation, and non-competition provisions in the Agreement are reasonable in light of Noble's legitimate business interests and the competitive nature of the government contracting industry.

84.    SupplyCore is an entity that is competitive with the business of Noble within the geographic area comprised of the territories assigned to Curry and for which she had responsibility during the twelve months immediately prior to the separation of her employment with Noble, as contemplated by Paragraph 5 of the Agreement.

85.    Through the acts described above, Curry breached her obligations under the Agreement, including, without limitation, by engaging in the same or substantially similar services or work as she performed for Noble for SupplyCore and by failing to inform SupplyCore of the Agreement during her interview process with SupplyCore.

86.    Curry continues to breach the Agreement by engaging in the same or substantially similar services or work as she performed for Noble for SupplyCore.

87.    Noble has performed all of its obligations under the Agreement.

88.     As a consequence of Curry's conduct, Noble has suffered and/or will continue to suffer irreparable harm or loss, and has suffered and will continue to suffer financial and economic loss.

89.     Curry's breach of the Agreement has proximately caused financial harm to Noble in an amount to be proven at trial.  Such amount, however, exceeds $75,000, which represents the value of an injunction protecting Noble against unfair competition from Curry and Noble's lost profits.

## REQUEST FOR INJUNCTIVE RELIEF

90.     Noble realleges and incorporates herein by reference all preceding paragraphs as if fully alleged herein.

91.     By virtue of the allegations in this Verified Complaint, Noble has demonstrated a likelihood of success on the merits and that a balancing of the equities favors the issuance of an injunction against Curry.

92.     Noble has and will continue to suffer irreparable harm if Curry is permitted to continue in SupplyCore's employ and solicit Noble's clients and customers in violation of her respective restrictive covenant obligations to Noble.

93.     The threatened injury to Noble, an organization whose value is tied in with preserving the sanctity of its confidential, proprietary, and trade secret information, far outweighs the potential harm to Curry who can ply her trade in ways that do not violate or interfere with Noble's restrictive covenant agreements.  Additionally, Curry agreed "that neither [she] nor [her] family will suffer irreparable harm as a result of the enforcement of the provisions set forth in this paragraph and in this Agreement."  (Ex. A ¶ 5.)

94.     Enforcing legal and valid contracts and preventing unfair competition is always in the public interest.  Curry agreed to abide by her restrictive covenant obligations to Noble.  As such, the entry of injunction to enforce these legal and valid agreements would be consistent with—and not adverse to—the public interest.

95.     Unless Curry is enjoined from engaging in any additional misconduct in violation of her restrictive covenant obligations to Noble, Noble will be irreparably harmed in the marketplace by the loss of customers and customer goodwill and by damage to its reputation in the government contracting marketplace.

96.     Such misconduct by Curry will result in substantial loss, which is unascertainable at this point in time, and future economic loss which presently is incalculable.

97.     Noble has no adequate remedy at law for Curry's misconduct, as money damages are not adequate to compensate for the ongoing harm caused by such misconduct.  Additionally, Curry has contractually agreed and acknowledged in the Agreement that "in addition to an appropriate award for damages, the Company shall be entitled to the entry of a temporary, preliminary and permanent order enjoining further threatened or actual breaches of the Agreement by him or any person, firm, or entity with which [she] is associated, without the need to post a bond or other security . . . ."  (Ex. A ¶ 7.)

## **PRAYER FOR RELIEF**

WHEREFORE, Plaintiff Noble Supply & Logistics, LLC respectfully requests the following relief from the Court:

A.  Injunctive relief against Curry, whether acting alone or in concert with others, requiring her to comply with her obligations under the Agreement;

B. An order requiring Curry, and anyone acting in concert with her, to preserve and not destroy or alter in any manner all documents or other information in her possession, custody or control (including, but not limited to, notes, calendar entries, invoices, e-mails, text messages, voice messages, and phone records) that may be relevant or discoverable in this litigation, including, but not limited to, all records and any other evidence of Curry's communications on behalf of or as an employee of SupplyCore with any Noble client, customer, or prospective client or customer as contemplated by the Agreement;

C. That the Court disgorge all amounts wrongfully attained by Curry as a result of her misconduct, plus pre-judgment and post-judgment interest;

D. An order temporarily, preliminarily, and permanently enjoining Curry from, for the duration of the restricted period, engaging in the same or substantially similar services or work for SupplyCore (or any other competitor) as she did for Noble, including managing vendor relations;

E. Actual damages in excess of $75,000.00, in an amount to be determined at trial;

F. Punitive damages in an amount to be determined at trial;

G. Attorneys' fees and costs;

H. Interest; and

I. Any other relief the Court deems appropriate.

## <u>REQUEST FOR JURY TRIAL</u>

Plaintiff respectfully requests a trial by jury.

This 11th day of October, 2023.

19

Respectfully submitted,

*/s/Heidi E. Siegmund*
Peter N. Farley (VSB No. 34592)
Heidi E. Siegmund (VSB No. 89569)
Daniel P. Peyton (VSB No. 97161)
**McGuireWoods LLP**
Gateway Plaza
800 East Canal Street
Richmond, Virginia 23219
(804) 775-1000
(804) 775-1061 (Facsimile)
pfarley@mcguirewoods.com
hsiegmund@mcguirewoods.com
dppeyton@mcguirewoods.com
*Attorneys for Noble Supply & Logistics*

## <u>VERIFICATION</u>

I, Stacy Williamson, am a duly authorized representative of Noble Supply & Logistics, LLC ("Plaintiff"). I hereby state that I have read the foregoing Verified Complaint and that the statements set forth therein are true as I believe based on my personal knowledge and information supplied to me by Plaintiff's employees and agents and through records kept by Plaintiff in the ordinary course of business. I understand that false statements herein are subject to the penalties of 28 U.S.C. § 1746 relating to sworn declarations.

Executed on this <u>11th</u> day of October, 2023.

DocuSigned by:

D05AD59CA4EB400...

Stacy Williamson
Chief People Officer