IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF VIRGINIA
Harrisonburg Division

_____

NOBLE SUPPLY & LOGISTICS, LLC,

      Plaintiff,

v.                                     Case No.: 5:23-cv-00065-EKD

REBECCA CURRY,

      Defendant.

_____

## MEMORANDUM OF LAW IN OPPOSITION TO NOBLE'S MOTION FOR TEMPORARY RESTRAINING ORDER AND PRELIMINARY INJUNCTION

_____

Defendant, Rebecca Curry ("Ms. Curry"), by and through undersigned counsel, sets forth the following as her Memorandum of Law in Opposition to Noble Supply and Logistics, LLC's ("Noble"),  Motion for a Temporary Restraining Order and Preliminary Injunction.

### INTRODUCTION

A preliminary injunction is an extraordinary remedy with a well-established set of requirements that are not met here, most notably: Noble has not established that it has a likelihood of success on the merits; and Noble lacks any evidence that it is being (or imminently will be) harmed, or that such harm cannot be repaired by money damages.  The most notable aspect of Noble's Motion is what it lacks: any evidence that (1) Ms. Curry breached her Confidentiality and Anti-Piracy Agreement (the "CAPA"); (2) Ms. Curry possesses any of Noble's proprietary or confidential information; (3) Ms. Curry's position with SupplyCore, Inc. ("SC") will require her to use Noble's proprietary or confidential information; (4) Ms. Curry has used or will use Noble's proprietary or confidential information; or (5) Noble has suffered or will suffer harm because of

1

Ms. Curry's employment with SC. Indeed, Noble's Motion lacks any relevant evidence whatsoever, much less sufficient evidence to justify the extraordinary relief it seeks.

Instead, Noble seeks to prohibit Ms. Curry from providing services explicitly allowed by the CAPA. Her services for SC are outside of the services she performed for Noble in the last 12 months of her employment there, and are certainly neither the same as nor substantially similar to her Noble duties. In all, Noble's Motion is nothing more than a blatant attempt to prevent Ms. Curry from doing what the CAPA expressly allows her to do—using her experience outside of the CAPA's proscriptions to make a living. Noble's Motion therefore should be summarily denied. In support of this Memorandum, Ms. Curry submits her own verified declaration, incorporated fully by reference herein, as Exhibit 1. Additionally, Ms. Curry submits the verified declaration of SC's Vice President of Organizational Development, Andre Balka, incorporated fully by reference herein, as Exhibit 2.

**STATEMENT OF FACTS**

**A. The Market, and Curry's Employment with TSSi**

The industry in which Noble and SC serve is unique in that there is a primary common customer – the United States government. (Curry Dec. ¶ 7.) The breadth of services and materials needed to serve all of the U.S. government's requirements varies greatly amongst a wide variety of market segments or categories. (Curry Dec. ¶ 8.) Within these unique market segments, there are specific and distinct representative products. (*Id.*) Ms. Curry began her work in this market in 2010, for a company called Tactical Survival & Specialties, Inc. ("TSSi"). (Curry Dec. ¶4.) Ms. Curry worked for TSSi from 2010 until March, 2021, when Noble acquired TSSi. (Verified Compl. ¶ 46.)

2

**B. The Underlying Agreement (the CAPA)**

While at TSSi, Ms. Curry executed the CAPA. (Verified Compl. ¶ 9.) The key provision, most relevant to Noble's claims, reads as follows:

> 5. <u>Non-Competition.</u> Employee acknowledges that he has and will have access to and knowledge of highly confidential and proprietary information regarding the Company including, for example, the Company's profits, margins, cost structure, key employees, marketing strategies, finances, customer and vendor relationships, and growth plans. Hence, in order to protect the company's legitimate interests in its highly valuable information ***Employee covenants and agrees that he will not, during Employee's employment with the Company, and for a period of twelve (12) months after the separation of his employment from the Company for any reason, voluntary or involuntary, engage in the same or substantially similar services or work as he performs for the Company for himself, or for any business or other entity, that is competitive with the business of the Company, within a geographic area comprised of the territories assigned to Employee and for which he had responsibility during the twelve months immediately prior to the separation of his employment from the Company.***

(Verified Compl. Ex. A.) Emphasis added.

**C. Noble's Market Segment Organization**

Following the acquisition of TSSi, Noble did not require Ms. Curry to sign a new restrictive covenant, or otherwise seek to amend the CAPA.  (Curry Dec. ¶ 2.)  When Ms. Curry was employed with TSSi, and at the time she executed the CAPA, she was originally involved with sales focusing almost exclusively on the Tactical market segment. (Curry Dec. ¶ 9.) She eventually became more involved with multiple market segments as the business diversified, but that stopped following Noble's acquisition of TSSi. (*Id.*)

Following its acquisition of TSSi, Noble eventually reorganized its structure of multiple market segments. (Curry Dec. ¶ ¶ 10, 11, 12.) There were six (6) distinct and separate market segments organized and separated by Noble. Each segment had its own, distinct, category manager

3

or director --- a single person responsible for established vendor relationships in that specific market segment. (*Id.*) Each market segment was distinct and did not overlap. (*Id.*)

Noble had distinct directors or managers in the following market segments: 1) Aerospace; 2) Command, Control, Communications & Computer/Cyber - Intelligence, Surveillance, & Reconnaissance) ("C5ISR"); 3) Chemical, Biological, Radiological, Nuclear and Explosive – explosive ordinance disposal ("CBRNE/EOD/Fire"); 4) Expeditionary; 5) Maintenance, Repair and Operations ("MRO"); and 6) Tactical. (*Id.*)  Each of these market segments has a unique array of products (in the thousands) and multiple vendors (in the hundreds) from whom Noble sources materials. (*Id.*)

### D. Curry's Duties & Responsibilities for Noble

For the last twelve plus months of her tenure at Noble, Ms. Curry's duties were substantially different than her duties with TSSi. The scope of her duties with Noble:

    a.  were *solely* dedicated to overseeing the Tactical sector (which includes medical supplies);

    b.  did not include any responsibility for the procurement/supply chain team;

    c.  involved no supervision or management of any direct reports, nor any supervisory responsibility over other employees at Noble;

    d.  was devoted to securing products needed for the Tactical market segment and enhancing existing vendor relationships in this particular market segment.  In fact, in the final 8-12 months of her employment with Noble, there was a large scale project involving McKinsey (a consultant), that required an analysis of 'Elite' Tactical vendors and required multiple weekly meetings, status updates, discussions with McKinsey and related briefs to Noble leadership.

(Curry Dec. ¶ 13.)

In her role overseeing the Tactical market segment for Noble, Ms. Curry was focused exclusively on working on sourcing the representative products for Tactical (which included: Weapons and Optics, Medical, Combat/Uniform Apparel, Armor/Shields, Bags/Packs, Helmets, Eyewear, Personal Hydration and Navigation, Handheld and Weapon-Mounted Lights, Breaching, Riot Equipment, K9, Parachutes, Non-Lethal Ammunition, Rappelling, Security, SCUBA, Flotation, Wetsuits). (Curry Dec. ¶ 14.) She did not get involved with other market segments or the representative products for such distinct market segments. (*Id.*)

In fact, most of Ms. Curry's day-to-day activities in the closing months to a year of her employment with Noble were spent on crisis management for accounts being shifted to "pre-pay" or "no quote" status by vendors for late or non-payment. (Curry Dec.. ¶ 17.) She was not responsible for payment to vendors, but was impacted by Noble's failure to timely pay vendors because the vendors were reluctant to do business with Noble, or would impose special terms on Noble, such as the requirement that Noble pre-pay for the material it purchased. (Curry Dec. ¶ 18.)

**E. Curry's Duties & Responsibilities for SC**

In June 2023, Ms. Curry verbally informed her direct supervisor and Vice President of Vendor Management for Noble, Sarah Rampmeyer, that she had a discussion with SC. (Curry Dec. ¶ 21.) Ms. Curry informed Rampmeyer that she didn't know what the end result would be or where it was going. (*Id.*) Ms. Curry confirmed that she was keeping her options open and that she had a conversation with SC due to the problems Noble created for itself (i.e. late payments to vendors). (*Id.*) Sarah voiced no concerns or objections. (*Id.*)

At SC, Ms. Curry's position and role has nothing to do with the Tactical market segment. (Balka Dec. ¶¶ 5, 6, 7, 8.) Rather, she is focused heavily on new vendors (unknown to her) outside

of the Tactical market segment and regarding market segments that have nothing to do with the Tactical market. (Curry Dec. ¶ 24.)  She has specifically avoided discussions with Noble's Tactical market vendors, even those that SupplyCore is already established and doing business with long before her employment. (*Id.*)  Specifically, she has been engaged in the following activities during her employment with SC:

    a.  The first two weeks of employment were almost entirely comprised of formal onboarding with the organization.  This included New Hire Orientation, Benefit Orientation, Meet Your Team, HR Policies Training, Performance Review Training, Workplace Harassment, Supervisor Training, Manager Interviewing Training, Manager Coaching Training, Corrective Reminder Documentation.

    b.  She started to receive formal training on the different systems and platforms that SC relies on like Paylocity, Envision, E-1, Dundas, etc. Aside from basic Microsoft Products and Salesforce, all enterprise and business-related platforms are completely new to her as she did not use any of them at Noble.

    c.  Since she joined the team during the busiest time of the year, one of the ways she could be most helpful was by simple data entry into the newly launched Salesforce system.  Cross-checking records with other systems to ensure POCs were accurate, socio-economic status of organizations, confirming web addresses, etc. This is a time-consuming and a never-ending project.

    d.  In the first several weeks she shadowed her direct supervisor to learn more about the organization.

    e.  She is heavily focused on process optimization, per her assigned job responsibilities.  She began to engage direct reports on process and system

inefficiencies, SOPs in place, documents being utilized and responsible parties they were engaging to complete their own daily work. She has focused on the general process flow for vetting, engaging and onboarding potential vendors outside of the Tactical market segment.

f.   She has reviewed the parameters and reporting structure for MRO supplier scorecards, tracking quote response times, # bids, and on-time delivery to determine most valuable approach.  There was a need to amend one of the data points where suppliers could challenge their response time so the team discussed at length.  She did not do this at Noble as she did not handle MRO vendors and Noble did not utilize any of these same platforms.

g.   By request or introduction of SC's Account Managers or VP of Global Business, she attended several strategy calls with potential new vendors (non-Tactical), most of which she had never even heard of like Axnes, Speed Queen and Norbit.

h.   She attended one trade show, AUSA, in Washington DC where she met some of SC's top vendors for the first time (non-Tactical) and engaged with coworkers who she was also meeting for the first time in many cases.  She intentionally focused on avoiding even being in or around the SC booth when a Tactical market segment vendor was present for a meeting with other SC personnel.

(*Id.*)

**F. SC's Good Faith Efforts to Avoid Conflict and Controversy**

Ms. Curry notified SC upon being made aware of the CAPA by Noble during her 2nd exit interview. (Curry Dec. ¶ 25.) In response, SC had Ms. Curry execute a written confirmation that she will not be involved in any way in the Tactical market segment and not be in breach of the

CAPA. (Balka Dec. ¶ 4.) Through correspondence from counsel, SC reassured Noble that Ms. Curry would not involve herself in any area, or with any vendor whom she worked with in the 12 months preceding her departure from Noble. (Verified Compl. Ex. B.)

She has kept her word. Ms. Curry has not shared or utilized any business information with SC concerning or relating to Noble. (Curry Dec. ¶¶ 22, 23.) Noble provides no evidence that she has actually solicited any vendors with whom she worked. In fact, she does not possess any business information that Noble claims or could reasonably claim encompasses their purported confidential information. (Curry Dec. ¶¶ 29, 30, 31.)

SC's communication to Noble was met with silence. For nearly two months Noble took no action and, by all appearances, was satisfied in knowing that Ms. Curry was removed from the Tactical market segment. Now, with no new evidence or allegations, Noble has brought this action.

## THE APPLICABLE STANDARD

"The standard for granting either a TRO or a preliminary injunction is the same." *Rum Creek Coal Sales, Inc. v. Caperton*, 926 F.2d 353 (4th Cir.1991); *Railway Labor Executives v. Wheeling Acquisition Corp.*, 736 F.Supp. 1397 (E.D.Va. 1990). "A preliminary injunction is an extraordinary remedy never awarded as of right." *Winter v. Natural Res. Def. Council, Inc.*, 555 U.S. 7, 24 (2008) (citation omitted). See also *Variable Annuity Life Ins. Co. v. Coreth*, 535 F. Supp. 3d 488, 501 (E.D. Va. 2021) ("Federal Rule of Civil Procedure 65 authorized federal courts to issue temporary restraining orders and preliminary injunctions. Both are 'extraordinary remedies involving the exercise of [a] very far-reaching power to be granted only sparingly and in limited circumstances'")(quoting *Sarsour v. Trump*, 245 F. Supp. 3d 719, 728 (E.D. Va. 2017)). The moving party bears the burden of "clearly establish[ing] entitlement to the relief sought." *Di Base v. SPX Corp.*, 872 F.3d 224, 230 (4th Cir. 2017).

To obtain a preliminary injunction the traditional standard requires this court to evaluate four factors: (1) the likelihood of irreparable harm to the Noble if the preliminary injunction is denied; (2) the likelihood of harm to the defendant if the requested relief is granted; (3) the likelihood that the Noble will succeed on the merits; and (4) the public interest. *Manning v. Hunt*, 119 F.3d 254, 263 (4th Cir. 1997) (quoting *Direx Israel, Ltd. v. Breakthrough Medical Corp*., 952 F.2d 802, 812 (4th Cir.1 991)). Noble bears the burden of establishing that the court should grant a preliminary injunction or temporary restraining order. *Hughes Network Systems, Inc. v. InterDigital Comm. Corp*., 17 F.3d 691, 693 (4th Cir. 1994).

"The failure to show any one of the relevant factors mandates denial of the preliminary injunction ...." *Parson v. Alcorn*, 157 F. Supp. 3d 479, 491 (E.D. Va. 2016). Moreover, even if the moving party satisfies all the elements, preliminary injunctions "are not to be granted automatically." *Wetzel v. Edwards*, 635 F.2d 283, 286 (4th Cir. 1980). The Court retains discretion whether to issue a preliminary injunction, which discretion should be "sparingly exercised." *Id.* As such, in deciding whether to grant injunction relief, the court should not lose sight of the maxim that a preliminary injunction is an "extraordinary remedy involving the exercise of a very far-reaching power." *Direx Israel, Ltd. v. Breakthrough Med. Corp.*, 952 F.2d 802, 811 (4th Cir. 1992).

## RESTRICTIVE COVENANTS UNDER VIRGINIA LAW

Restrictive employment covenants "are not favored, will be strictly construed, and, in the event of an ambiguity, will be construed in favor of the employee." *See Modern Env'ts., Inc. v. Stinnett,* 263 Va. 491, 493, 561 S.E.2d 694 (2002) (citing *Richardson v. Paxton Co.,* 203 Va. 790, 795, 127 S.E.2d 113 (1962)). Non-compete agreements "`have been upheld only when employees are prohibited from competing directly with the former employer or through employment with a

direct competitor.'" *Lanmark Tech., Inc. v. Canales,* 454 F.Supp.2d 524, 528 (E.D.Va.2006) (quoting *Omniplex World Servs. Corp. v. U.S. Investigations Servs. Inc.,* 270 Va. 246, 618 S.E.2d 340 (2005)). "With respect to employment with a direct competitor, non-compete clauses that `restrict the former employee's performance of functions for his new employer [are upheld] *only to the extent that the proscribed functions are the same functions as were performed for the former employer*.'" *Lanmark Tech., Inc. v. Canales*, 454 F.Supp.2d 524, 528 (E.D.Va.2006) (quoting *Cantol, Inc. v. McDaniel*, No. 2:06cv86 2006 WL 1213992 at *4 (E.D.Va. April 28, 2006) (emphasis added); see also *Roanoke Eng'g Sales Co. v. Rosenbaum*, 223 Va. 548, 553, 290 S.E.2d 882 (Va.1982) (finding noncompetition covenant reasonable because employment restriction was limited to activities similar to business conducted by former employer).

The burden rests with the employer to show that the provision is no greater than necessary to protect the employer's legitimate business interests, is not unduly burdensome on the employee's ability to earn a living, and does not offend sound public policy. *See, e.g., Lanmark Tech., Inc,* 454 F.Supp.2d at 528-29; *Modern Env'ts.,* 263 Va. at 493, 561 S.E.2d 694; *Roanoke Eng'g Sales Co. v. Rosenbaum,* 223 Va. 548, 552, 290 S.E.2d 882 (1982). Facts to be considered include the function, geographic scope, and duration of any restriction. *Simmons v. Miller,* 261 Va. 561, 581, 544 S.E.2d 666 (2001).

Importantly, courts employing this three-part test listed above must take the non-compete as written; courts have no authority under Virginia law to "`blue pencil' or otherwise rewrite the contract" to eliminate illegal overbreadth. *Pais v. Automation Products,* 36 Va. Cir. 230, 239, 1995 WL 17049090 (1995). Thus, where a non-compete clause is ambiguous, susceptible to two or more differing interpretations, one of which is overbroad and unenforceable, the entire clause fails even though it may be reasonable as applied to the specific circumstances. *Id.* at 57-58.

## ARGUMENT

### A.  Noble Has Not Met Its Burden to Show Entitlement to an Injunction

#### 1.  Noble Cannot Establish a Likelihood of Success

##### a.  The Underlying Agreement is Unlawful under the NLRA

Pursuant to the National Labor Relations Act (the "NLRA"), the CAPA contains a number of provisions that violate Section 7 of the NLRA, in that Ms. Curry was not a supervisor as defined under the NLRA at the time of her separation from Noble --- and for a duration that spanned at least twelve (12) months prior to said separation. (Curry Dec. ¶ 3.)  The CAPA on its face, is not only overbroad, but it chills or otherwise interferes with, restrains, and coerces employees in the exercise of their rights guaranteed in Section 7 of the NLRA. As such, the court can and should declare it unenforceable. Ms. Curry has filed a Charge with the NLRB based on Noble's continued attempts to enforce an illegal agreement. (Curry Dec. ¶ 6.)  Noble is engaging in an unlawful course of conduct, in violation of Section 8(a)(1) of the NLRA, designed to chill and/or discourage Ms. Curry from the right to resign her employment, access other employment opportunities and demand and/or secure better working conditions.[1]  Accordingly, Noble cannot seek to enforce what it cannot enforce under the law.

##### b.  Curry Has Not Breached, and Will Not Breach, the CAPA

The most glaring omission, among many, in Noble's motion, is its failure to address the clear language of the CAPA. It does not prohibit Ms. Curry from any and all work at a competitor; rather, it seeks to prohibit competition "for any business or other entity, that is competitive with

---

[1] The General Counsel of the National Labor Relations Board has explained that, except in limited circumstances (such as those dealing with supervisory/managerial employees), "the proffer, maintenance, and enforcement of [non-compete] agreements violate Section 8(a)(1) of the Act."  *See* Memorandum GC 23-08, 2023 WL 375775 (N.L.R.B.G.C.) (May 30, 2023).

the business of the Company … for which he had responsibility during the twelve months immediately prior to the separation of his employment from the Company."

It is undisputed that Ms. Curry has not, and will not, perform the services similar to those she performed in the last twelve months of her employment with Noble. Both Ms. Curry's Declaration, and that of Andre Balka, SC's Vice President of Organizational Development, establish that she has not breached the language of the CAPA, nor must she in order to perform her job with SC.

Noble's rank speculation to the contrary is insufficient to establish a breach. Ms. Curry and SC have conclusively established that there is no need for her to breach the CAPA to do her job. There is simply no evidence that Ms. Curry has breached, or will breach, the CAPA.

At the very least, the Court should deny Noble's requested relief because the noncompete clause, especially as Noble attempts to enforce it, contains ambiguous language susceptible to interpretation rendering it functionally overbroad. "With respect to employment with a direct competitor, non-compete clauses that `restrict the former employee's performance of functions for his new employer [are upheld] *only to the extent that the proscribed functions are the same functions as were performed for the former employer*.'" *Lanmark*,  454 F.Supp.2d at 528.

Here, it is clear that Ms. Curry's responsibilities in the last 12+ months of her employment were exclusively in the Tactical market segment. Noble acknowledges as much in its brief. However; when Noble attempts to prohibit her from a wider range of activities than those explicitly proscribed in the CAPA, it goes too far. The Court cannot blue pencil the CAPA to fit Noble's interpretation. In fact, given the ambiguity in Noble's application, the Court must strike the entire provision.

In short, one of two things is true. Either Ms. Curry has not breached the CAPA, and Noble is not entitled to relief, or Noble is seeking protection beyond the plain language of the CAPA, and therefore beyond that to which it is legally entitled. Either way, Noble is simply not entitled to the relief it seeks.

And, contrary to Noble's claims, Ms. Curry's general posts on LinkedIn announcing her new position do not constitute "solicitations" under the CAPA. The language of the CAPA is clear. Paragraph 3 is entitled "Solicitation of Customers." In it, the employee agrees not to:

> sell to, service and/or in any way solicit (in person, telephonically, through e-mail and/or through any other medium or person), **for the purpose of selling or providing products or services competitive with the products and services of the Company**, **any person or entity that was a client or customer of the Company**, or was a prospective client or customer of the Company (meaning any person or entity that was actively solicited by the Company), during the twelve months prior to the date of the Employee's separation from the Company, with which the Employee had "material contact" (which is defined as being directly involved in the solicitation, sale or quotation of the Company's products or services), or about which the Employee has "material knowledge" (which is defined as having material and substantive knowledge of the Company's efforts to solicit, sell to, or quote the Company's products or services to the prospect or customer, or of the services provided to the customer by the Company). (Emphasis added.)

There is no allegation that Ms. Curry solicited any "customer" of Noble. Noble could have sought to prohibit solicitation of *vendors* as well as *customers*. It chose not to. The Court cannot blue pencil the contract to provide Noble's preferred interpretation. At worst, Ms. Curry's general posts generated reaction from a handful of her LinkedIn connections. None of them were customers. Most of them are personal friends.  (Curry Dec. ¶¶ 33, 34, 35, 36, 37, 38, 39, 40, 41.) Noble's attempt in trying to make something out of the generic LinkedIn posts are a distraction from the unmistakable fact that Ms. Curry has taken no action to harm or could possibly harm Noble.  Noble has no "smoking gun" here and they are now grasping at straws.

   c. **Noble May Not Use the Inevitable Disclosure Doctrine to Expand the Scope of its Bargained-For Restrictive Covenants as it is Contrary to Applicable Law and Public Policy**

Lacking any proof of unlawful conduct, Noble may attempt to use the inevitable disclosure doctrine to impermissibly expand the narrow scope of its bargained-for restrictive covenants. Noble's efforts to impose obligations to which Ms. Curry never agreed both is improper under substantive law and contrary to public policy.

"[T]he inevitable disclosure doctrine treads an exceedingly narrow path through judicially disfavored territory." *EarthWeb, Inc. v. Schlack*, 71 F. Supp. 2d 299, 310 (S.D.N.Y. 1999). As such, "the doctrine should be applied only in the rarest of cases." *Id.* As a general principle, "a court should not allow a Noble to use inevitable disclosure as an after-the-fact noncompete agreement to enjoin an employee from working for the employer of his or her choice." *Del Monte Fresh Produce Co. v. Dole Food Co.,* 148 F. Supp. 2d 1326, 1337 (S.D. Fla. 2001); *see also Bridgestone/Firestone, Inc. v. Lockhart*, 5 F. Supp. 2d 667, (S.D. Ind. 1998) ("A claim of trade secret misappropriation should not act as an ex post facto covenant not to compete."); *Int'l Bus. Mach. Corp. v. Seagate Tech. Inc.*, 941 F. Supp. 98, 101 (D. Minn. 1992) (same).

Virginia does not adhere to the inevitable disclosure doctrine. See, e.g., *Atlantic Diving Supply, Inc. v. Basnight,* No. 2:22cv298, 2022 WL 5568083 (E.D. Va. Sept. 21, 2022); *Gov't Tech. Servs., Inc. v. IntelliSys Tech. Corp*., 1999 WL 1499548, at *1 (Va. Cir. 1999) ("Virginia does not recognize the inevitable disclosure doctrine."). Noble cannot use inevitable disclosure to expand the scope of the CAPA.

   2. **Noble Will Not Suffer Irreparable Harm**

Although often stated as the second required element of a preliminary injunction, irreparable harm may be the most important one. *Direx*, 952 F.2d at 812 ("When deciding whether

to grant a preliminary injunction, the court must first determine whether the Noble has made a strong showing of irreparable harm if the injunction is denied.") (internal quotation marks and citation omitted). Under federal law, Noble must demonstrate more than just a 'possibility' of irreparable harm. "Issuing a preliminary injunction based only on a possibility of irreparable harm is inconsistent with [the] characterization of injunctive relief as an extraordinary remedy that may only be awarded upon a 'clear showing' that the employer is entitled to relief." *Di Base*, 872 F.3d at 230 (quoting *Winter*, 555 U.S. at 22); *see also Scott's Co. v. United Indus. Co.*, 315 F.3d 264, 271 (4th Cir. 2002) ("When deciding whether to grant a preliminary injunction, the court must first determine whether the employer has made a *strong showing* of irreparable harm if the injunction is denied.") (emphasis added).

To meet this burden, Noble must show that "[i]rreparable harm [is] neither remote nor speculative, but actual and imminent." *Update v. Samilow*, 311 F. Supp. 3d 784, 796 (E.D. Va. 2018) (internal quotation marks and citation omitted). Noble's evidence (or lack thereof) in support of its request for a temporary restraining order falters at the outset because it fails to make any, let alone a strong, showing that Noble will suffer imminent, irreparable harm absent injunctive relief.

Here, Noble has not alleged that it lost a single customer or vendor, nor lost any goodwill, based on anything Ms. Curry has done. While Noble points to "the threat of a permanent loss of customers and the potential loss of goodwill" to support a finding of irreparable harm, it makes no factual allegations of either. A loss of any customer is impossible. Both Noble and SC serve the same customer. Further, there is no allegation that any vendor has left Noble for SC based on any alleged action of Ms. Curry. And for any alleged loss of goodwill, Noble has self-inflicted a loss of goodwill by failing to pay its vendors timely amongst other issues. (Curry Dec. ¶¶ 17, 18, 44.)

15

It does not allege that Ms. Curry has done anything to cause a loss of goodwill. In sum, Noble cannot establish that it has or will suffer irreparable harm.[2]

In short, there is always a potential to lose customers or goodwill. But Noble has failed completely to tie that vague notion to anything that Ms. Curry has done.

### 3.   Enjoining Curry is Contrary to the Public Interest

Enjoining an employee from lawfully practicing her profession in compliance with her contractual obligations does not advance the public interest. Yet, that is precisely what Noble asks this Court to do. While public interest favors the enforcement of valid restrictive covenants, it similarly "is a matter of public interest to see that non-compete agreements that are likely invalid" or have not been violated "do not receive the extraordinary relief of a preliminary injunction." *Tech. Partners, Inc. v. Hart*, 298 F. App'x 238, 244 (4th Cir. 2008). Accordingly, "in sharply disputed cases like this, the public interest is best served if the parties are subject to the normal litigation process." *Id.* Ms. Curry's employment with SC does not violate her purported obligations under the CAPA.

That public policy disfavoring the application of the underlying non-compete under the circumstances is also clear as recently expressed by the National Labor Relations Board (the "NLRB") and by the Federal Trade Commission (the "FTC"). These expressions of public policy are particularly applicable, as the primary customer of both Noble and SC is the United States Government.

---

[2] To the extent that Noble contends that, under the terms of the CAPA, a breach automatically constitutes irreparable harm because the parties so agreed, that obviously raises the question of whether there has been a breach.  Moreover, the mandatory prudential consideration of requiring a party to show irreparable harm to obtain a preliminary injunction cannot be contractually abrogated.  In any event, because Noble has not shown a breach or because Noble has not shown any actual (or imminent) harm, the Court should refrain from issuing a TRO or any other preliminary remedy.

The General Counsel for the National Labor Relations Board has opined that non-competes violate the NLRA. Section 7 of the NLRA protects employees' rights to self-organization, collective bargaining, and other concerted activities. *See* NLRB Memorandum GC 23-08 (May 30, 2023).  Section 8(a)(1) of the NLRA prohibits employers from interfering with, restraining, or coercing employees in the exercise of their Section 7 rights. According to the General Counsel, except in limited circumstances, offering, maintaining, or enforcing a non-compete agreement violates Section 8(a)(1) of the NLRA by chilling employees in the exercise of Section 7 rights. (*Id.*)

Additionally, Recently, the FTC also weighed in on the public policy considerations of non-competes as an unfair method of competition. The FTC's Notice of Proposed Rulemaking stated as follows:

> "Pursuant to Sections 5 and 6(g) of the Federal Trade Commission Act, the Federal Trade Commission ("Commission") is proposing the Non-Compete Clause Rule. The proposed rule would, among other things, provide that it is an unfair method of competition for an employer to enter into or attempt to enter into a non-compete clause with a worker; to maintain with a worker a non-compete clause; or, under certain circumstances, to represent to a worker that the worker is subject to a non-compete clause.

88 FR 3482

### 4.  The Balance of Equities Weighs Against an Injunction

Contrary to Noble's boilerplate argument, the balance of equities weighs heavily against an injunction. This factor requires the court to weigh the harm to Noble without the injunction against the harm to Ms. Curry if she is enjoined. Because she has voluntarily complied, and will voluntarily continue to comply, with the CAPA obligations, the harm to Noble without an injunction is non-existent.

While Noble claims it will suffer some, nebulous damages in the form of "potential" lost customers and "potential" lost goodwill, it provides no evidence to support these claims. Like every other aspect of Noble's Complaint and Motion, this argument is filled with unsubstantiated and unsupported hyperbole. Noble does not identify a single customer, acquisition, or other business it has lost because of Ms. Curry's employment with SC or any "competitive advantage" SC gained over Noble when it hired her. As the evidence in this case makes clear, there is none.

The harm to Ms. Curry if she is enjoined from working for SC in any capacity or in a capacity whereby she's delegated tasks that she is over qualified to perform, on the other hand, is significant. She stands to lose substantial compensation and a job she accepted, in large part, because Noble's own actions made the performance of her job with Noble exceedingly difficult.

## CONCLUSION

Noble cannot provide substantial proof of *any* of the requirements to obtain a Temporary Restraining Order or a Preliminary Injunction. It has no irreparable harm, is unlikely to prevail on the merits of its Complaint, and the balance of equities favors Ms. Curry. Having utterly failed in its burden of proof, Noble is not entitled to the relief requested.  The Court should deny the motion.


DATED: October 23rd, 2023.

Respectfully submitted,

/s/ King F. Tower
King F. Tower (VSB No. 38767)
king.tower@wrvblaw.com
Woods Rogers Vandeventer Black PLC
10 South Jefferson Street, Suite 1800
Roanoke VA 24011
Telephone: (540) 983-7600
Facsimile (540) 983-7711

18

Jeffrey A. Risch (Illinois ARDC NO: 627140)
jrisch@amundsendavislaw.com
Amundsen Davis, LLC
3815 E. Main St., Suite A-1,
St. Charles, IL 60174
Telephone (630) 569-0079

Craig A. Kubiak (WI SBN 1019273)
ckubiak@amundsendavislaw.com
Amundsen Davis, LLC
2800 Enterprise Avenue
Appleton, WI 54913
Telephone: (920) 750-5049

## **CERTIFICATE OF SERVICE**

I hereby certify that on this 23rd day of October, 2023, I electronically filed the foregoing with the Clerk of Court using the CM/ECF system which will send notice to all counsel of record.

/s/ King F. Tower