CLERK'S OFFICE U.S. DIST. COURT
AT HARRISONBURG, VA
FILED

September 09, 2024
LAURA A. AUSTIN, CLERK
BY:  s/J.Vasquez
DEPUTY CLERK

IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF VIRGINIA
HARRISONBURG DIVISION

| | | |
|---|---|---|
| NOBLE SUPPLY & LOGISTICS, LLC, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | Civil Action No. 5:23-cv-00065 |
| v. | ) | |
| | ) | By: Elizabeth K. Dillon |
| REBECCA CURRY, | ) | Chief United States District Judge |
| | ) | |
| Defendant. | ) | |

**MEMORANDUM OPINION**

Plaintiff Noble Supply & Logistics, LLC (Noble) has sued its former employee, Rebecca

Curry (Curry), alleging that she breached certain restrictive covenants in violation of the

employment agreement she signed with Noble's predecessor, Tactical & Survival Specialties,

Inc. (TSSi).  The court earlier granted Noble's motion for a temporary restraining order (TRO).

(Dkt. No. 31 (memorandum opinion and order); *see also* Dkt. No. 39 (converting Dkt. No. 31 to

a temporary restraining order from a preliminary injunction).)  Thereafter, the parties engaged in

discovery, and, on May 10, 2024, the court conducted an evidentiary hearing on Noble's motion

for preliminary injunction (the MPI hearing).  (Dkt. No. 62; *see also* May 10, 2024 Hr'g Tr. (Tr),

Dkt. No. 67.)  The parties also submitted deposition designations and post-hearing briefing on

the motion, which the court has considered.  Days after the hearing, and largely with the

agreement of the parties,[1] the court modified the TRO to narrow its scope.  (Dkt. No. 63.)  For

the reasons set forth herein, the court will deny Noble's motion for preliminary injunction and

---

[1] To be clear, Curry argued that the TRO should be dissolved altogether.  But the court directed the parties to discuss and agree upon a revised version of the TRO that at least was consistent with the narrowed scope of relief sought by Noble.  The parties disagreed on some minor points, and the court resolved those to its satisfaction in its modified order.

will vacate the previously entered temporary restraining order.[2]

Also pending before the court is Curry's motion to dismiss.  (Dkt. No. 23.)  As discussed herein, the court will grant that motion in part.  Regarding the remainder of the motion—and because it requires the court to determine the enforceability of the non-compete provision—the court intends to construe Curry's motion as a motion for summary judgment and to consider the same evidence submitted in connection with the preliminary injunction motion.  Before ruling on it, however, the court will allow the parties an additional opportunity to submit further information or argument.  *See* Fed. R. Civ. P. 12(d).

## I.  BACKGROUND

The allegations in the verified complaint were discussed in the court's prior memorandum opinion, and the court assumes that the reader is familiar with that background. For context, however, it also will include some of that information herein.

## A.  Curry's Agreement

Consistent with information in the verified complaint, Curry testified that she signed the "Confidentiality and Antipiracy Agreement" (the Agreement) in 2010 when she began working with Noble's predecessor, TSSi.  (Tr. 54–55; *see also* Pl.'s Ex. 5, also Ex. A to Verified Compl., Dkt. No. 1-2.)[3]  The Agreement includes confidentiality and non-disclosure covenants, non-

---

[2]  The court required only a nominal $500 bond, which Noble obtained and posted prior to issuance of the TRO.  (*See* Dkt. No. 32.)  The court leaves for another day a determination of whether Curry is entitled to execution on the bond.  *Cf. Greenwood County v. Duke Power Co.*, 107 F.2d 484, 489 (4th Cir. 1939) (noting that an award of damages under a bond "is not a matter of right, but one resting in the sound discretion of the court"); *Lasercomb Am., Inc. v. Holliday*, 961 F.2d 211, 1992 WL 91898, at *5 (4th Cir. 1992) (unpublished table decision) (calling *Greenwood* "controlling circuit precedent"); *Glaxo Grp. Ltd. v. Leavitt*, 481 F. Supp. 2d 434, 437 (D. Md. 2007) (taking the position that a "wrongfully enjoined defendant is not automatically entitled to the full amount of an injunction bond," but may recover non-speculative damages proximately caused by the injunction).  *Cf. also Network Int'l L.C. v. Worldcom Techs., Inc.*, 133 F. Supp. 2d 713, 717-20 (D. Md. 2001) (surveying various standards applied by federal courts in determining whether damages from a later-dissolved injunction should be paid from a bond).

[3]  References to hearing exhibits are cited as "Pl.'s Ex. #" or "Def.'s Ex. #."  All hearing exhibits are docketed at Dkt. No. 65.

solicitation covenants for both customers and employees, and non-competition covenants. (Agreement ¶¶ 1–5.)

Although the complaint refers to all of these covenants, as of the May 2024 hearing, the only covenant Noble alleges that Curry breached is the non-competition covenant in paragraph 5. *See also infra* Section II-A-2 (noting, in addressing the motion to dismiss, that the complaint does not allege a breach of confidentiality covenants and dismissing any such claim).

In the non-competition portion of the Agreement, Curry specifically acknowledges that she "has and will have access to and knowledge of highly confidential and proprietary information regarding the Company." (Agreement ¶ 5.)

The paragraph continues:

> [I]n order to protect the company's legitimate interests in its highly valuable information Employee covenants and agrees that [she] will not, during Employee's employment with the Company, and for a period of twelve (12) months after the separation of [her] employment from the Company for any reason, voluntary or involuntary, engage in the same or substantially similar services or work as [she] performs for the Company for [herself], or for any business or other entity, that is competitive with the business of the Company, within a geographic area comprised of the territories assigned to Employee and for which [she] had responsibility during the twelve months immediately prior to the separation of [her] employment from the Company.

(*Id.*)

Curry further acknowledges that "this geographic area is reasonable and appropriate because it is the geographic area in which [she] has/had direct responsibility and authority for the Company and because [she] has/had access to confidential and proprietary information of the Company pertaining to customers in this geographic area." (*Id.*) Curry also agrees that "this restriction is reasonable and appropriate due to the narrow scope of the Company's business, as a result of which the Employee has ample opportunity to obtain employment without violating the

3

terms of this Agreement, and without suffering hardship or duress" and that "neither [she] nor [her] family will suffer irreparable harm as a result of the enforcement of the provisions set forth in this paragraph and in this Agreement."[4]  (*Id.*)

Noble contends that the non-competition covenant is necessary because Curry received and had access to (and in some cases developed or directed the development of) specific propriety and confidential information.  Possession of such information would give a competitor, such as SupplyCore, an "enormous unfair advantage" by allowing that competitor information to effectively undercut Noble while directly competing against it for contracts.[5]  (Mem. Supp. of Mot. Prelim. Inj. 4, Dkt. No. 4.)

In a section titled "Enforcement," the Agreement provides:

> The Employee acknowledges that in addition to an appropriate award for damages, the Company shall be entitled to the entry of a temporary, preliminary[,] and permanent order enjoining further threatened or actual breaches of the Agreement by [her] or any person, firm, or entity with which [she] is associated, without the need to post a bond or other security, and to collect from the Employee all costs of the Company, including reasonable attorney's fees, incurred by the Company in enforcing and/or defending any of the terms or provisions of this Agreement.

(Agreement ¶ 7.)  The Agreement further states that it is governed by Virginia law and an action to enforce it must be brought in a state or federal court in Virginia.  (*Id.* ¶ 9.)

---

[4]  Curry testified that her personal circumstances were significantly different at the time she signed the agreement than they are presently.  At the time, she was not married, had no children, and did not "even [have] a car payment." (Tr. 257.)  Now, she is married and has a child.  (*Id.*)

[5]  It is undisputed that Noble and SupplyCore are direct competitors.  They are two of a small number of prime contractors who compete to provide the federal government or its agencies with supplies under the Defense Logistics Agency's (DLA) Special Operational Equipment Tailored Logistics Support Program contract, also referred to by the parties as the TLS SOE Contract.  (*See generally* Tr. 152–53 (discussing contract); *id.* at 82–83 (Curry admitting that the two are direct competitors on the TLS SOE contract); *see also* Verified Compl. ¶¶ 20, 22.)  The SOE Contract is a ten-year, multi-billion-dollar contract, with indefinite delivery and quantities, which was awarded to Noble, SupplyCore, and a limited number of other businesses, who compete to obtain contracts under the SOE Contract.  (Verified Compl. ¶¶ 23, 24.)

**B.  Curry's Employment**

Curry was employed by TSSi and then Noble from October 2010 through August 2023.
She held several positions over the course of her employment.  At the time was hired and
executed the Agreement in 2010, she was involved with sales, focusing primarily—but not
exclusively—on the tactical market segment.  (Curry Decl. ¶ 9, Dkt. No. 19-1.)  She worked in
multiple market segments as TSSi's business diversified.  (Strang Dep. 65 (explaining that Curry
worked on a variety of product categories while at TSSi, although TSSi did not divide its
workforce by categories; that her work involved categories outside of what is now called tactical
and medical; and that after Noble acquired TSSi and then another company, Curry's role became
focused on tactical and medical); Tr. 228–29 (setting forth some of the same facts).)
Immediately before TSSi's acquisition by Noble, Curry oversaw the procurement team as TSSi's
"Director of Vendor Relations."  In that role, she supervised four or five people and was
responsible for all the buyer activity and vendor management at TSSi.  (Curry Dep. 53–54.)

Noble acquired TSSi through a stock purchase and became "the successor to TSSi
for all practical purposes."  (Tr. 67.)  At some point after the acquisition, Curry still had
the same title, but was stripped of her supervisory responsibilities, and she worked
primarily in the tactical and expeditionary categories.  (Curry Dep. 49.)  Later, in or about
early 2022, after Noble had acquired another company—Federal Resources—there was a
reorganization and her position changed.  At that point, she became the Director of
Category Management for the Tactical division.  As she described it, her job description
was "vastly different."  (Curry Dep. 54.)  She no longer oversaw or was responsible for
"multiple categories," but instead she was responsible only for the tactical vendors, and
as the category manager she was tasked primarily with maintenance of the "high volume"

or "elite" vendors.  (Curry Dep. 54; Tr. 151.)  In that role, she was responsible "for managing the vendor relationships and the supplier relationships of original equipment manufacturers and suppliers who specifically manufactured or produced tactical and medical equipment for first responders and the military."  (Tr. 151.)  She also continued to have no supervisory responsibilities, including after her return from maternity leave in approximately April 2022.

Curry began working for SupplyCore in mid-August 2023, and was given the title of Director of Vendor Management and Supply Chain.  Her anticipated duties are set forth in a document she created at the request of her direct supervisor Brian Easley.  (Pl.'s Ex. 3.)  The intent of the document was to carve out more specific responsibilities as between their two roles.  (Tr. 50.)

After Curry was reminded of the Agreement in her exit interview with Noble, she immediately notified SupplyCore.  Shortly thereafter, Curry and SupplyCore signed what the parties have called an "Expectations Letter."[6]  (Pl.'s Ex. 4.)  In it, they agreed Curry could not share information on, solicit, or engage "with any customer or supplier specific to the Tactical Gear and Medical commodity categories or any related commodity categories you have previously managed" and prohibited her from having "any contact with customers or suppliers you previously engaged with at Noble" and "sharing related contact information with SupplyCore."  (*Id.* at 3.)

At the MPI hearing, there was a lot of testimony concerning whether Curry breached the Agreement.  Additionally, there is a significant amount of designated deposition testimony that discusses Curry's communications with individuals outside of both SupplyCore and Noble and

---

[6] The court previously referred to this document as "the SupplyCore Agreement."

whether those communications constituted a breach of the Agreement, the Expectations Letter, or both. Noble emphasizes that Curry's direct supervisor testified in his deposition, after being shown communications Curry had with vendor contacts, that he did not believe she had complied with the Expectations Letter as to some (but not all) of her communications. (*See, e.g.*, Easley Dep. 144–150 (stating that Exhibits 75, 76, and 77 are communications that were not in compliance with the limitations placed on Curry under the Expectations Letter).)[7] In light of the court's conclusion herein that Noble cannot show a likelihood of success on the merits because the Agreement likely is unenforceable, the court need not discuss that evidence in any detail.[8]

## C. Noble's Changing Requests for Injunctive Relief

Noble's interpretation both of the scope of the non-compete and of the appropriate injunctive relief has changed over the course of this litigation. In particular, Noble has changed its interpretation of the final portion of paragraph 5, stating that Curry shall not "engage in the same or substantially similar services or work as [she] performs for the Company for [herself], or for any business or other entity, that is competitive with the business of the Company, within a geographic area comprised of the territories assigned to Employee and for which [she] had responsibility during the twelve months immediately prior to the separation of [her] employment

---

[7] In her response, Curry criticizes Noble for its focus on alleged breaches of the Expectations Letter, contending that any such "breaches" are irrelevant and do not shed light on whether she breached the Agreement with Noble. Noble defends its discussion of the Expectations Letter as proving that "neither Curry nor SupplyCore can be trusted or relied upon to respect Noble's contractual rights" absent a court order. (Post-Hr'g Reply Br. 8, Dkt. No. 72.)

[8] Even if there were breaches of the unenforceable agreement, the court notes that it found Curry's testimony at the MPI hearing to be honest, credible, and forthright. Moreover, Curry had accepted the job at SupplyCore before being informed of the Agreement in her exit interview, which she had forgotten existed—a fact Noble has not disputed. Further, in leaving, Curry's conduct reflected that she was acting in good faith to avoid harming Noble. Indeed, Noble's 30(b)(6) representative admitted as much. (Tr. 208–09.) Specifically, Williamson testified that Noble was not claiming that Curry took anything with her and was not claiming that she had used confidential information to harm Noble. Noble found nothing in its investigation to reflect that she took anything or emailed anything to herself. Further, Curry was helpful to Noble and Noble employees both in the time after she gave notice and even after she left and was working for SupplyCore. (*Id.*)

from the Company."  (Agreement ¶ 5.)

At the earlier TRO hearing, Noble specifically argued that the non-competition covenant was not limited to jobs that Curry held in the last twelve months of her employment, but to all jobs she held while with the company; the reference to the last twelve months of her employment applied only to the geographic limitation.  (TRO Hr'g Tr. 33–35, Dkt. No. 25.)  Noble also specifically argued that the agreement did not only preclude Curry from working in a "particular segment," but it barred her from working in a position she had worked for while with Noble that is competitive with SupplyCore, as to *any* market segment.  (*Id.* at 11, 34.)

As noted, the court initially adopted this first interpretation given by Noble, and it enjoined Curry, for a twelve-month period from the date of the order, from (1) "working for SupplyCore Inc. in the position of Director of Vendor Management & Supply Chain"; and from (2) "engaging in the same or substantially similar services or work as she performed for Noble for herself, or any other business or entity that is competitive with the business of Noble, within the United States."  (Dkt. No. 31, at 18.)

During discovery, however—and in her testimony at the MPI hearing—Noble's 30(b)(6) representative admitted that Noble did not need protection from Curry outside of her vendor management role in the tactical and medical fields, and—according to Stacy Lee Williamson[9]— regarding working on the SOE contract.  (Tr. 203–04.)  This testimony effectively admitted that, to the extent the agreement was broader than that—as Noble had previously argued and as the court had found—it was broader than necessary to protect Noble's interests.  Williamson further admitted that there were "hundreds, if not thousands, of vendors that would be in categories other than tactical" that Curry could work with.  (*Id.* at 203.)

---

[9]  Williamson is Noble's head of human resources and served as Noble's Rule 30(b)(6) representative.

Subsequently, and shortly after the May 10, 2024 hearing, the court modified the TRO utilizing language it had directed the parties to attempt to agree upon and then submit.[10]  The modified TRO enjoined Curry,

> for a period of twelve months from the original date of the Temporary Restraining Order of December 7, 2023 (ECF Nos. 31 and 39) from working for SupplyCore, Inc. in the position of Director of Vendor Management & Supply Chain but only with respect to performing the job duties and responsibilities of Director of Vendor Management & Supply Chain in the tactical and medical market segments and for vendors or suppliers of SupplyCore, Inc. that sell goods or services in the tactical and medical market segments to SupplyCore, Inc.

(Modified TRO, Dkt. No. 63.)

Apparently recognizing that its representative's admission precludes it from contending that the broad scope of the Agreement (as it had argued it at the TRO hearing), was necessary to protect its interests, Noble shifted course in its post-hearing brief.  Presumably in an attempt to limit the scope of the non-compete, Noble's post-hearing brief argues—the court believes for the first time—that the Agreement only restricts Curry from performing the same services she provided *Noble*, not its predecessor, TSSi.  (Noble Post-Hr'g Br. 6, Dkt. No. 68.)  Noble hinges its argument on a separate provision that states a successor "shall be deemed substituted for all purposes for the 'Company' under the terms of this Agreement."  (Agreement ¶ 12.)  It notes that, since Noble acquired TSSi in March 2021, Curry's work has been exclusively in vendor relations, "principally with regard to the tactical and medical market segment."  (Tr. 56, 73.)  From this, Noble argues that the Agreement only limits Curry from working in that same type of position and with regard to only those market segments.

The court notes here why it does not find this new argument persuasive and does not

---

[10]  *See supra* note 1.

interpret the contract so narrowly.  First, Noble cites no authority for this interpretation.  Second, this argument is belied by the plain language of the contract itself.  The provision Noble cites states that Noble is substituted for TSSi for *all purposes*.  So, the agreement is treated as if it was signed by Noble initially and Noble is permitted to enforce it terms.  That is a more natural reading of the "substitution" provision in the Agreement.  Third, the court concludes that Noble's interpretation would lead to absurd results.  Under its logic, if a high-level, long-term employee resigned the day before the company's ownership changed hands, and even though the acquiring company had obtained all assets—assets that include the departing employee's non-compete— the acquiring company would be unable to enforce such an agreement because the employee never would have worked for the "Company."  Thus, the court rejects this interpretation of the Agreement and does not discuss it further.

In its post-hearing briefing, Noble asks the court to grant a preliminary injunction in the same form as the revised TRO, which would allow Curry to work in other market segments, but not in the tactical and medical categories as a Director of Vendor Management.  Curry insists that the TRO should be dissolved and that no preliminary injunction should issue.

## II.   DISCUSSION

### A.  Curry's Motion to Dismiss

#### 1.  Part of Curry's Motion to Dismiss Is Premature.

Raising a threshold issue in its opposition to the motion to dismiss, Noble contends that Curry's motion is premature and should not even be considered by the court, arguing that the enforceability of restrictive covenants cannot be determined as a matter of law apart from the presentation of evidence.  (Opp'n to Mot. to Dismiss 1, Dkt. No. 29 (citing *Assurance Data, Inc. v. Malyevac*, 747 S.E.2d 804, 808–09 (Va. 2013)).)  In *Assurance Data*, the Supreme Court of

Virginia discussed the general law governing the enforceability of restrictive covenants and then summarized that the "premise running through [its prior decisions] is that restraints on competition are neither enforceable nor unenforceable in a factual vacuum." 747 S.E.2d at 808. Instead, the court must base its decision on evidence presented to ascertain whether a restraint "is narrowly drawn to protect the employer's legitimate business interest, is not unduly burdensome on the employee's ability to earn a living, and is not against public policy." *Id.* Noble also cites to a decision from another judge of this court denying a motion to dismiss challenging a restrictive covenant as overbroad, relying on *Assurance Data*, in addition to other decisions. (Opp'n to Mot. Dismiss 1 (citing *O'Sullivan Films v. Neaves*, 2017 WL 4798997, at *8 (W.D. Va. Oct. 24, 2017) ("*Neaves I*"); *see also id.* at 7–8 (collecting authority holding same from both W.D. Va. cases and E.D. Va. cases). In *Neaves I*, Judge Urbanski stated plainly that "*Assurance Data* forecloses facial attacks on restrictive covenants."

In her reply, Curry contends that the cases Noble relies upon are inapplicable because they were all decided in the context of an *unverified* complaint. Here, by contrast, there is a verified complaint and so the issue is not being decided "in a vacuum," but with specific factual allegations (and a record, of sorts) that are not just allegations. Curry argues that Noble's verified complaint "constitutes evidence of precisely the type needed" to evaluate enforceability, and this court's decision would not be made in a vacuum. (Reply to Opp'n to Mot. Dismiss 2, Dkt. No. 30.)

Curry also relies on *Power Home Solar, LLC v. Sigora Solar, LLC*, No. 3:20-cv-00042, 2021 WL 3856459 (W.D. Va. Aug. 30, 2021) (Cullen, J.), citing it for the proposition that the enforceability of a restrictive covenant can be determined on a motion to dismiss. Although there is language in that case supporting Curry's position, the court did not determine

enforceability on a motion to dismiss.  Instead, Judge Cullen provided notice at the motion-to-dismiss hearing that he was considering converting the motion (as to Count 1, which required a determination of the enforceability of a restrictive covenant) to a summary judgment motion, and he provided the plaintiff (the former employer) an opportunity to file an affidavit "outlining any discoverable information regarding the reasonableness of the restrictive covenants at issue." *Power Home Solar*, 2021 WL 3856459, at *3.  The plaintiff submitted such an affidavit, and Judge Cullen converted the motion to dismiss to a motion for summary judgment as to that count, relying upon the affidavit.  *Id.* at *3–4.  Ultimately, he granted the motion for summary judgment.

Other than citing to *Power Home Solar*, Curry points to no other cases in Virginia—state or federal—where a court directly rejected the general proposition of *Assurance Data*, *i.e.*, that enforceability cannot be decided on a motion to dismiss.  This court will follow the majority of other courts and concludes that the motion to dismiss is premature, based on the reasoning of *Assurance Data*.  Accordingly, the court will not rule on any portion of the motion to dismiss that involves determining the enforceability of the restrictive covenants.

Further, the fact that the complaint here is verified does not compel a different result.  In *Apex Systems, LLC v. Beacon Hill Staffing Grp., LLC*, No. 3:21cv165, 2021 WL 5760854 (E.D. Va. Dec. 3, 2021), for example, the court found *Assurance Data* applied and denied the motion as premature even in the face of a verified complaint.  *Id.* at *9.  That court went on to note that the arguments for dismissal on the merits could be "dispensed with on their own terms" and addressed them, but it emphasized that they were premature.  *Id.*

Although the court believes *Assurance Data* bars a ruling on the motion to dismiss, the court also recognizes that it has additional information before it based on the evidence presented

at the hearing on the motion for preliminary injunction.  Indeed, as the parties recognized at the conclusion of the May 2024 hearing, the court now has significant additional information before it, based on the evidence presented by the parties in conjunction with the motion for preliminary injunction.

But if the court were to consider information outside the complaint, it must—as the *Power Home Solar, LLC* court did—give notice that it intends to convert the motion to a summary judgment motion and give plaintiff an opportunity to present any additional evidence in opposition to the motion.  In fact, Curry urged that approach if the court declined to rule on the motion to dismiss as premature, (Reply to Opp'n to Mot. Dismiss 4), and Noble's counsel at the MPI hearing suggested that was an appropriate course of action, as well.  (Tr. 281.) Accordingly, as to the claims requiring a determination of the enforceability of the covenant not-to-compete, the court notifies the parties that it intends to convert the motion to a summary judgment motion and give each party an opportunity to present any additional evidence or argument, if they so choose.[11]

### 2.  Any Claims Based on a Breach of the Confidentiality Provisions Must Be Dismissed.

A portion of Curry's motion to dismiss, however, is not premised on the agreement's enforceability, and the court will address that portion of the motion.  Specifically, Curry interprets Noble's complaint as suing only for a breach of the provision prohibiting the taking or use of confidential information and the non-compete provision, and it notes that the complaint does not contain any facts to support a finding that Curry breached the confidentiality provision. (*See* Mem. Supp. Mot. to Dismiss 7–8, Dkt. No. 24 (arguing that there "are no substantive

---

[11] This procedure will not preclude any party from filing a subsequent motion for summary judgment later in the case.

allegations that she took or used confidential information," so any portion of the complaint asserting such a claim must be dismissed).)

As to this issue, the parties appear to agree.  Noble does not contest this in its response and points to the fact that the breach-of-contract claim itself is for a breach of the "non-competition covenants."  It explains that it provides a "more fulsome background" on the other covenants "to demonstrate the measures it takes to protect its confidential information and business interests, which is a consideration directly relevant to the enforceability of a non-competition provision."  (Opp'n to Mot. to Dismiss 2 n.1.)  Similarly, although Noble's witness at the hearing, Williamson, suggested that the company was concerned about the confidentiality provision, she also conceded that Curry did not take any confidential information when she left Noble.  (Tr. 170, 208–09.)  Thus, to the extent the complaint could be construed as asserting a breach of contract claim based on the misuse of confidential information, the motion to dismiss will be granted and any such claim dismissed.[12]

## B.  Noble's Motion for Preliminary Injunction

"The traditional office of a preliminary injunction is to protect the status quo and to prevent irreparable harm during the pendency of a lawsuit ultimately to preserve the court's ability to render a meaningful judgment on the merits."  *In re Microsoft Corp. Antitrust Litig.*, 333 F.3d 517, 525 (4th Cir. 2003).  Preliminary injunctive relief is an extraordinary remedy that courts should apply sparingly.  *See Direx Israel, Ltd. v. Breakthrough Med. Corp.*, 952 F.2d 802, 811 (4th Cir. 1991).  The party seeking the preliminary injunction must demonstrate that: (1) it is likely to succeed on the merits at trial; (2) it is likely to suffer irreparable harm in the absence of

---

[12]  Curry also argues that the complaint does not adequately allege that she has violated the non-solicitation covenant in Paragraph 3 of the Agreement.  (Mem. Supp. Mot. to Dismiss 7.)  Noble states that it did not assert a breach of the Agreement under Paragraph 3, but it "reserves all rights to move for leave to amend" to add such a claim.  (Post-Hr'g Reply Br. 9 n.5.)

preliminary relief; (3) the balance of equities tips in its favor; and (4) an injunction is in the public interest. *Winter v. Natural Res. Def. Council, Inc.*, 555 U.S. 7, 20, 22 (2008); *League of Women Voters of N.C. v. North Carolina*, 769 F.3d 224, 249 (4th Cir. 2014). The remedy may be granted only on a "clear showing" of entitlement to relief. *Winter*, 555 U.S. at 22.

For purposes of a motion for preliminary injunction, the court may consider any testimony offered at a preliminary injunction hearing as well as declarations and affidavits submitted by the parties. The Fourth Circuit has determined that a district court ruling on a preliminary injunction "may look to, and indeed in appropriate circumstances rely on, hearsay or other inadmissible evidence when deciding whether a preliminary injunction is warranted." *G.G. ex rel. Grimm v. Gloucester Cty. Sch. Bd.*, 822 F.3d 709, 725–26 (4th Cir. 2016), *vacated and remanded on other grounds*, 580 U.S. 1168 (2017).

### 1. Likelihood of success on the merits

The first requirement Noble must satisfy is to "demonstrate that they are likely to succeed on the merits." *Pashby v. Delia*, 709 F.3d 307, 321 (4th Cir. 2013) (citing *Winter*, 555 U.S. at 20). "Although this inquiry requires plaintiffs seeking injunctions to make a 'clear showing' that they are likely to succeed at trial," *Real Truth*, 575 F.3d at 345, a plaintiff need not show a certainty of success, *see Pashby*, 709 F.3d at 321.

When ruling on the motion for temporary restraining order, the court concluded that Noble had shown a likelihood of success on its breach of contract claim. Specifically, the court concluded Noble had shown it was likely to be able to establish: (1) a legally enforceable obligation of Curry to Noble, (2) Curry's violation or breach of that obligation, and (3) injury or damage to Noble caused by the breach of obligation. *See Filak v. George*, 594 S.E.2d 610, 619 (Va. 2004).

The court has received additional evidence from the parties, including—importantly—Noble's concession that it needs narrower protection than that provided by the Agreement. Based on that new evidence, the court now concludes that Noble has not shown it is likely to prevail on its breach of contract claim, because it has not shown a legally enforceable obligation. In particular, the burden rests on Noble to show that the restrictive covenant extends no greater than necessary to protect its legitimate business interests, is not unduly burdensome on Curry's ability to earn a living, and does not offend sound public policy. *See, e.g.*, *Landmark Tech., Inc. v. Canales*, 454 F. Supp. 2d 524, 528–29 (E.D. Va. 2006). Factors bearing on the reasonableness of the restriction include its function, geographic scope, and duration, *Simmons v. Miller*, 544 S.E.2d 666, 678 (Va. 2001), which the court should "assess . . . together rather than as distinct inquiries," *Preferred Sys. Solutions, Inc. v. GP Consulting, LLC*, 732 S.E.2d 676, 681 (Va. 2012).

> a. *The duration of the non-compete*

In looking at the three relevant factors, the court does not find the time-period or geographic scope to be particularly burdensome. As to the length of time, the non-competition covenant is 12 months long, which is shorter than others upheld by Virginia courts. *O'Sullivan Films, Inc. v. Neaves* (*Neaves II*), 352 F. Supp. 3d 617, 625 n.1 (W.D. Va. 2018) (collecting authority, including Virginia cases upholding non-competes of a two-year duration).

> b. *The non-competes of other Noble employees do not render Curry's unreasonable, either in duration or overall.*

Curry attempts to challenge as unreasonable the length (as well as the overall scope) by pointing to non-competition agreements of other Noble employees and former employees. The parties' briefing addresses at length whether the court can consider these other employees'

agreements (or lack thereof) in determining the reasonableness of Curry's agreement.[13]

Curry notes, for example, that non-competes TSSi obtained from employees prior to Noble's acquisition of TSSi, as well as agreements Noble negotiated more recently, either include shorter time periods for non-competes or do not exist for certain employees at all, even those at the same level of the organization as Curry.  Williamson testified that, of the six category managers who were in similar roles as Curry from January 1, 2023, going forward, either they did not have non-competition agreements, or the length of the non-compete provisions in their agreements was six months, as opposed to the 12-month limitation in Curry's agreement, and other restrictive covenants also were of a shorter duration.  (*See generally* Tr. 175–178, 181–83, 202.)  From this, Curry contends that *her* agreement was broader than necessary to protect Noble's interests, because Noble did not find it necessary to impose on employees in like roles a similarly long restriction or, for some, a restriction at all.[14]

Noble counters with authority holding that other employees' non-competes are irrelevant when determining the reasonableness of a restrictive covenant.  Instead, it notes, "[e]ach non-competition agreement must be evaluated on its own merits."  *Omniplex World Servs. Corp. v. U.S. Investigations Servs., Inc.*, 216 S.E.2d 340, 342 (Va. 2005).  And it cites to non-binding cases, primarily from other jurisdictions, in which courts have rejected the argument that other agreements bear on the reasonableness of the plaintiff's agreement.  *See Macro Techs., LLC v.*

---

[13]  The court may not technically need to resolve this issue given its ruling in Curry's favor on enforceability in the context of the MPI, but because the same issue is raised in the motion to dismiss (now converted to a motion for summary judgment in part), and has been fully briefed, the court will address it here.

[14]  This is not the only interpretation to draw from the differences between Curry's and her colleagues' agreements.  Indeed, Williamson testified that when developing more recent noncompetition agreements that were presented to employees, there was a miscommunication between counsel advising as to the agreements and the company, and the non-competition provision was inadvertently omitted.  (Tr. 186–87.)  She testified that the company had intended to put a noncompetition provision in the versions given to employees in August 2023 and Noble was "in the process of reissuing agreements to all of [its] employees.  (*Id.* at 187–88.)

*Midkiff*, No. 19-cv-2323, 2020 WL 13558312, at *9 (D. Minn. June 4, 2020) (addressing discovery dispute and concluding that the reasonableness of defendants' non-competes did "not hinge in any way" on whether the company "required other employees to sign similar non-compete agreements"); *Proctor & Gamble Co. v. Stoneham*, 747 N.E.2d 268, 276 (Ohio Ct. App. 2000) (holding that a non-compete was not unreasonable just because the employer "waived the non-compete provision as to some executives who had the same exposure to confidential information"); *Cutright v. Metro. Life Ins. Co.*, 491 S.E.2d 308, 314 (W. Va. 1997) (finding non-competes reasonable "even if other employees negotiate better deals"). Noble further relies on authority that reasonableness must be assessed as of "the time [the employee] entered into the covenant." (Noble Post-Hr'g Br. 7 (quoting *Cap. One Fin. Corp. v. Kanas*, 871 F. Supp. 2d 520, 532 (E.D. Va. 2012)).) Based on that authority, Noble contends that agreements that were signed after Curry's have no bearing on its reasonableness.

For her part, Curry relies on several cases. The first is *Cook v. Robinson*, No. 5:11CV6, 2011 WL 4708855 (N.D.W. Va. Oct. 4, 2011). There, the district court noted that a party made an argument regarding the lack of non-competes for other employees. *See Cook*, 2011 WL 4708855, at *8. Noble correctly points out that the exact wording of that portion of the opinion does not state how or whether the court credited that argument. (Noble Post-Hr'g Br. 10.) But the context in which it appears suggests that the court considered that argument in reaching its conclusion that the employer failed to show that the covenant was needed to protect is relationships with its customers. *Cook*, 2011 WL 4708855, at *8. Thus, the court will presume that the *Cook* decision supports Curry's position. Regardless, the *Cook* court failed to cite to *Cutright*, which was a binding decision of the West Virginia Supreme Court, which calls the reasoning of *Cook* into question.

18

Curry also cites to *Gagliardi Bros. v. Caputo*, 538 F. Supp. 525, 529 (E.D. Pa. 1982), and to *Estee Lauder Companies Inc. v. Batra*, 430 F. Supp. 2d 158, 161 (S.D.N.Y. 2006).  In *Gagliardi Bros.*, the court considered it "significant" that the employer had not required non-compete agreements from other employees for a number of years, because it "strongly suggest[ed]" that the company "does not perceive any need for the imposition of restrictive covenants."  *Id.* at 529.  This part of the court's analysis arguably was dicta.  The court said that it "also found" the covenant unenforceable because it was not reasonably limited for the employer's protection, but the court had already concluded that the covenant was not enforceable because the agreement lacked consideration.  *Id.* at 528.  The lack of consideration alone was dispositive.  Even if dicta, though, the court's reasoning supports Curry's position.

Similarly, in *Batra*, the court noted that other executives either had shorter durations for their non-competes and relied on that fact, in part, to conclude that the employee's 12-month non-compete was greater than necessary to protect the former employer's interests.  430 F. Supp. 2d at 182.

As Curry acknowledges, none of these cases is binding on this court, and the court finds the contrary authority more persuasive, particularly given the Supreme Court of Virginia's direction to evaluate each non-compete "on its own merits."  *Omniplex World Servs. Corp.*, 216 S.E.2d at 342.  Thus, the court will not consider the absence of other non-competes or their shorter terms in determining whether Curry's Agreement is overbroad.

     *c.   The non-compete's geographic restriction*

Turning to the geographic restriction, Curry argues in her motion to dismiss that the geographic reach of the clause is overbroad.  (Mem. Supp. Mot. to Dismiss 13–14.)  She describes it as "essentially limitless," given the complaint's references to Noble's (and Curry's)

19

Based on the new evidence before it, the court agrees with Curry that the function likely is overbroad, such that Noble is unlikely to prevail on the merits.  As described above, Curry worked in both sales and vendor management at TSSi/Noble, and in categories other than just the tactical and medical categories in her role as a vendor manager.  But Noble's witnesses stated (and counsel argued) that Noble only needed protection by preventing Curry from managing vendors as to those categories.  As such, Noble has effectively admitted that the Agreement is broader than necessary to protect Noble's interests.  Considering that, along with the time and geographic restrictions (one year and at least a national market), as the court must,[16] provides further support for a finding of overbreadth.

Curry describes Noble's new position as being "that it could never have prohibited Ms. Curry from working outside of tactical/medical."  (Post-Hr'g Opp'n Br. 9.)  And she accuses Noble of advancing a "new position [that] is a unilateral attempt to blue pencil its own agreement," which Curry argues is prohibited under Virginia law.[17]  (*Id.*)  She summarizes:

> In the end, one of two things must be true.  Either Noble took two reasonable positions, one of which it now acknowledges was overbroad, or its first position was unreasonable, and it obtained the admittedly overbroad TRO under false pretenses.  Either way, Noble loses, and it is not entitled to a preliminary injunction.  *See Lanmark*, 454 F. Supp. 2d [at] 529.

(*Id.*)

---

[16] *See Preferred Sys. Solutions, Inc.*, 732 S.E.2d at 681 (directing that a court must consider all three factors together).

[17] Curry argues that Virginia law does not allow courts to "blue pencil or otherwise rewrite the contract" to eliminate overbreadth or to cure ambiguity.  (Opp'n to Mot. Prelim. Inj. 10 (citing *Pais v. Automation Prods.*, 36 Va. Cir. 230, 239, 1995 WL 17049090 (Va. Cir. Ct. 1995)).)  In its reply, Noble challenges the persuasiveness of the *Canales* decision and its interpretation of *Pais*.  (See Post-Hr'g Reply Br. 3–4.)  Noble does not appear to challenge the general principle, though, that Virginia courts are precluded from blue-penciling an overbroad restrictive covenant to make it enforceable.  And that principle has been stated by numerous federal district court decisions, not just the *Canales* court.  *E.g.*, *GMS Indus. Supply, Inc. v. G & S Supply,* LLC, 441 F. Supp. 3d 221, 227–28 (E.D. Va. 2020).  Noble merely argues that blue-penciling is not required here.

Curry's briefing repeatedly implies that Noble or its attorneys acted in bath faith, but the court need not determine whether anyone acted in bad faith.[18]  To be sure, the court was surprised when, at the MPI hearing, Noble indicated a willingness to limit the temporary restraining order to restrain Curry only from "perform[ing] . . . ." competing work in the tactical and medical sector, with certain additional restrictions, and that it did not seek to enjoin her from performing vendor management in other sectors.  Noble's position at the TRO hearing was that the agreement was much broader, and the court's temporary restraining order adopted that position.

Now, however, Noble concedes that it can adequately protect its business interests by precluding Curry from working only as a vendor manager in the tactical and medical categories.  As such, any broader interpretation of the agreement—like the one which Noble previously urged and the court adopted—renders it overbroad to protect Noble's business interests.  In sum, Noble cannot meet its burden to show that a non-compete is "narrowly drawn to protect" its "legitimate business interest."  *See Lanmark Tech., Inc.*, 454 F. Supp. 2d at 528 (citation omitted).  Given the admitted overbreadth, the court now concludes that it is likely that the non-compete in the Agreement is unenforceable under Virginia law.  As such, Noble cannot show a likelihood of success on the merits of its breach of contract claim.

### 2.  Remaining Requirements for Preliminary Injunction

Considering its conclusion that the agreement likely is unenforceable and that Noble cannot show a likelihood of success on the merits, the court need not address the remaining requirements for a preliminary injunction, such as whether Noble is likely to suffer irreparable

---

[18]  It is possible that the change in position was simply the result of learning additional information.  Curry disputes this, noting that Noble is relying on information within the knowledge of its own Rule 30(b)(6) representative to limit its request for injunctive relief.  It points out that such knowledge always was within Noble's possession.

harm absent the injunction, the balance of the equities, and the public interest.  *See Winter*, 555

U.S. at 20.  It notes, however, that a ruling on a preliminary injunction does not "conclusively

determine the rights of the parties"; it is an attempt to "balance the equities as the litigation

moves forward."  *See also Trump v. Int'l Refugee Assistance Project*, 582 U.S. 571, 580 (2017).

Indeed, equity plays a large role in the court's decision.  As the Fourth Circuit has recognized, a

preliminary injunction "is not granted as a matter of course, and whether to grant the injunction

still remains in the equitable discretion of the [district] court even when a plaintiff has made the

requisite showing."  *Bethesda Softworks, L.L.C. v. Interplay Entm't Corp.*, 452 F. App'x 351,

353 (4th Cir. 2011) (internal citations omitted); *see also Roswell v. Mayor & City Council of

Baltimore*, 671 F. Supp. 3d 607, 616 (D. Md. 2023), *aff'd,* No. 23-1567, 2023 WL 8728503 (4th

Cir. Dec. 19, 2023) (citing *Bethesda Softworks, L.LC.* and declining to grant a preliminary

injunction).

The court concludes that the equities here favor Curry.  First, Curry and SupplyCore

made at least some efforts (however imperfect) to limit Curry's work to categories outside of

tactical and medical, from the time she started working for SupplyCore, more than twelve

months ago.  Then, Noble received the benefit of the broader temporary restraining order,

entered December 7, 2023, keeping Curry from working in *any category* if performing a vendor

relations function.  That broad restriction required Curry to change jobs and made her ineligible

for a merit raise.  (Tr. 79–80.)  That injunction remained in place until mid-May, when it was

narrowed after Noble changed its position as to the needed scope of the TRO.  Thus, Noble

received five months of an admittedly overbroad injunction, and has received an additional four

months of a narrowed injunction pending this court's decision on the preliminary injunction

motion.  In light of that, equity also favors the denial of the motion for preliminary injunction.

III.   CONCLUSION

For the reasons stated above, Noble Supply's motion for preliminary injunction as to its breach of contract claim (Dkt. No. 3) will be denied.  Curry's motion to dismiss (Dkt. No. 23) will be granted in part as to claims based on a breach of the confidentiality provision of the Agreement.  The remainder of Curry's motion will be construed as a motion for summary judgment, and the parties will be given an opportunity to submit any additional information and argument in conjunction with that motion.

An appropriate order will be entered.

Entered: September 9, 2024.

/s/ Elizabeth K. Dillon
Elizabeth K. Dillon
Chief United States District Judge